# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DENISE CAUDILL,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv00047 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand this case for further consideration by the Commissioner.

## I. Background and Standard of Review

Plaintiff, Denise Caudill, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Caudill protectively filed her applications for SSI and DIB on or about March 15, 2001, alleging disability as of November 21, 1999, based on interstitial cystitis, a nervous condition, severe burning of the bladder, pain during intercourse and chronic pain. (Record, ("R."), at 83, 91, 116, 364-69.)[1] The claims were denied initially and on reconsideration. (R. at 54-56, 57, 58-59, 372-73.) Caudill then requested a hearing before an administrative law judge, ("ALJ"). (R. at 60.) The ALJ held a hearing on July 16, 2002,[2] at which Caudill was represented by counsel. (R. at 433-56.) By decision dated August 2, 2002, the ALJ denied Caudill's claims. (R. at 33-45.) After the ALJ issued his decision, Caudill pursued her administrative appeals. (R. at 33-35.) By order dated June 27, 2003, the Appeals Council remanded the case to the ALJ for further evaluation of Caudill's mental impairment and any

---

[1]The record does not contain Caudill's DIB application.

[2]On April 17, 2002, the ALJ held a hearing during which he received various medical records into evidence. No testimony was taken at that time. However, the record was held open for the submission of additional evidence. (R. at 428-32.)

-2-

associated limitations on her work-related abilities as a result thereof. (R. at 72-74.) The ALJ held another hearing on February 25, 2004, at which Caudill was again represented by counsel. (R. at 457-74.)

By decision dated March 24, 2004, the ALJ denied Caudill's claims. (R. at 15-23.) The ALJ found that Caudill met the nondisability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 23.) The ALJ found that Caudill had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 23.) The ALJ found that the medical evidence established that Caudill had a history of interstitial cystitis.[3] (R. at 23.) However, the ALJ concluded that Caudill did not suffer from a severe impairment. (R. at 23.) Therefore, the ALJ found that Caudill was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(c), 416.920(c) (2006).

After the ALJ issued his decision, Caudill pursued her administrative appeals, (R. at 10-11), but the Appeals Council denied her request for review. (R. at 6-9.) Caudill then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on Caudill's motion for summary judgment filed February 21, 2006, and the Commissioner's motion for summary judgment filed March 6, 2006.

---

[3]Interstitial cystitis is a "condition of the bladder occurring predominantly in women, with an inflammatory lesion, usually in the vertex, and involving the entire thickness of the wall, appearing as a small patch of brownish red mucosa, surrounded by a network of radiating vessels. The lesions ... may heal superficially, and are notoriously difficult to detect. Typically, there is urinary frequency and pain on bladder filling and at the end of [urination]." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 424, 1038 (27th ed. 1988).

-3-

## II. Facts

Caudill was born in 1963, (R. at 83, 364), which classifies her as a " younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Caudill has a high school education with some college. (R. at 97, 436-37.) Caudill has past work experience as a department head in a department store, a shelf stocker and a cashier. (R. at 92, 100-02.)

At her July 16, 2002, hearing, Caudill testified that she was enrolled in special education classes in math and language arts. (R. at 437.) She stated that she went to college for one and a half years in a general studies program, but had to quit because she had to work. (R. at 437.) She stated that she last worked in October 1999 at a department store. (R. at 438.) Caudill testified that she worked there for nine years. (R. at 438.) She stated that her positions there included a department head, a cashier and a stocker. (R. at 438.) Caudill testified that during her last six months of work, she was absent approximately two months due to bladder problems and side effects of her medications. (R. at 441.) She stated that her employer informed her that the department store was going to close in November 1999. (R. at 442.)

Caudill testified that, at the time of the hearing, she was taking Elavil three times daily, which made her very sleepy. (R. at 442.) She stated that her dosage of Elavil was increased in 2000 before being placed on Elmiron. (R. at 442.) Caudill stated that the Elavil would make her sleep for approximately three hours, at which time it was time to take it again. (R. at 443.) Thus, Caudill testified that she spent most of her day sleeping. (R. at 443.) Caudill testified that she did not perform any

-4-

household chores. (R. at 443.) She stated that when she was awake during the day, she would watch television and take a bath. (R. at 443.) Caudill further testified that her medication made her dizzy, causing her to fall three months prior to the hearing. (R. at 444.) She stated that without the medication, she would be unable to tolerate her pain, which she experienced all of the time. (R. at 444.) She stated that the medication did not completely alleviate her pain. (R. at 444.) Caudill testified that her medication also caused frequent urination, causing her to go to the bathroom three times each hour. (R. at 444.)

Caudill testified that she began seeing a counselor in February 2002 due to depression. (R. at 445.) She stated that it had helped "to a certain degree," but she noted that she remained depressed. (R. at 445.) Robert Spangler, a psychological expert, also was present and testified at Caudill's hearing. (R. at 455-56.) Spangler testified that an individual with a Global Assessment of Functioning, ("GAF"), score of 50 for 12 continuous months would not be able to perform any jobs.[4] (R. at 455-56.)

At her February 25, 2004, hearing, Caudill testified that she was no longer taking Elavil. (R. at 461.) Instead, she stated that she was taking Neurontin. (R. at 461.) She testified that she continued to suffer from depression. (R. at 461.) Caudill also noted crying spells and mood swings. (R. at 462.) Caudill testified that she had

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41 to 50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

-5-

been referred to psychologist Lanthorn for testing, but was unable to complete it due to cataracts on both eyes resulting in an inability to read. (R. at 462.) She stated that she informed Lanthorn that she was willing to return to complete the testing at a later time, but that she was never contacted about this. (R. at 462.)

Thomas Edward Schacht, a psychological expert, also was present and testified at Caudill's hearing. (R. at 463-71.) Schacht testified that Caudill graduated in the middle of her class. (R. at 464.) He noted that Caudill had an IQ score of 91 in the sixth grade, which corresponded to the 14th percentile. (R. at 464-65.) He further noted that she scored in the 21st percentile in the eighth grade, but in only the fourth percentile in the eleventh grade. (R. at 465.) Schacht opined that Caudill's testing score was so low in the eleventh grade because she disregarded the math test since her grade equivalent was lower than when she took the test in the eighth grade. (R. at 465.) Schacht further noted that there was a conflict in the record regarding Caudill's emotional impairment. (R. at 465.) Specifically, Schacht noted that on July 13, 2001, Dr. Blackwell noted that Caudill "denies any anxiety or depression." (R. at 465.) However, six months later, she reported severe marital conflict during counseling and was diagnosed with depression. (R. at 465.) Schacht further noted that Caudill was not seen by a psychiatrist or for psychotherapy. (R. at 465.) Instead, he noted that she had a handful of contacts with a case manager. (R. at 465.)

Schacht testified that Caudill had no history of treatment for depression by her primary care physician. (R. at 465.) She only was given prescriptions at various times for trycyclic antidepressant medications in low doses, including imipramine and Elavil, but they were not prescribed for treatment of a mental disorder. (R. at 465-66.)

-6-

Instead, these prescriptions were given for the treatment of Caudill's bladder problem because they have a side effect of causing urinary retention. (R. at 466.) In July 2002, Caudill complained to Dr. Brazee of sleepiness due to her medications. (R. at 466.) However, Schacht noted that Caudill was no longer taking these medications. (R. at 466.) He further noted that her then-current medication, Neurontin, was of quite a low dosage and he noted that she was taking it at night so that any side effect of drowsiness should not be a problem. (R. at 466.) In any event, Schacht noted that Caudill had made no complaints of sedation to the prescribing clinician. (R. at 466.) Schacht testified that the results of the consultative examination performed in August 2003 were likely invalid either because of Caudill's vision difficulties and/or for poor effort, which the examiner noted. (R. at 466-67.)

Schacht noted that although Caudill testified that she stopped taking Elavil in August 2003, according to the records of Dr. Ward, she was still on Elavil in December 2003. (R. at 469.) He further noted that Dr. Ward, who placed Caudill on Neurontin, also placed her on desipramine which is an antidepressant and which Dr. Ward noted was for the treatment of depression. (R. at 469.) Schacht testified that nothing in Dr. Ward's notes indicated that Caudill suffered from a severe mood disorder and the low dosage of desipramine was not an aggressive treatment for depression.[5] (R. at 469.) The desipramine was being continued as of at least February 10, 2004, as indicated by Dr. Kao's notes. (R. at 469.)

Schacht testified that Caudill was initially assessed a GAF score of 50 by

---

[5] I note that the Dr. Ward's treatment note does not contain the dosage of desipramine prescribed for Caudill. (R. at 328-29.)

-7-

Kegley.  (R. at 469.)  However, Schacht stated that 50 is the automatic initial GAF score that was carried through by the computer in the treatment notes.  (R. at 469-70.) Although Kegley later noted a GAF score of 60,[6] Schacht testified that there was no basis for this change because Kegley had not reevaluated Caudill.  (R. at 470.)

Schacht concluded that Caudill did not suffer from a listing level mental impairment.  (R. at 470.)  Also, he stated that the existence of a severe mental impairment was not supported by the evidence contained in the record.  (R. at 470.) Caudill testified that she stopped treatment at Wise County Behavioral Health Services because she could not afford it and she did not have any insurance.  (R. at 471.)

Donna Bardsley, a vocational expert, also was present and testified at Caudill's hearing.  (R. at 471-73.)  Bardsley was asked to consider a hypothetical individual of Caudill's age, education and work history who was of low average intellect, could perform light work and who was seriously limited, but not precluded, in her ability to demonstrate reliability.  (R. at 472-73.)  Bardsley testified that if such an individual would miss more than one day of work each month, then there would be no jobs that she could perform.  (R. at 473.)  However, Bardsley testified that the same individual with a fair ability to demonstrate reliability would be able to perform simple, unskilled jobs under the Medical-Vocational Guidelines, ("the Grids"), found at 20 C.F.R. Part 404, Subpart P, Appendix 2.  (R. at 473.)  Finally, Bardsley testified that an individual with the limitations as testified to by Caudill would not be able to perform any jobs.

---

[6]A GAF of 51 to 60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...."  DSM-IV at 32.

(R. at 473.)

In rendering his decision, the ALJ reviewed records from Dr. Louise J. Brazee, M.D.; Dr. Marguerite C. Lippert, M.D.; Dr. Donald R. Williams, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Kevin Blackwell, D.O.; Howard Leizer, Ph.D., a state agency psychologist; Robert O. McGuffin, M.D., a state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; Howard Leizer, Ph.D., a state agency psychologist; Dr. Lidia W. L. Kao, M.D.; Lonesome Pine Hospital; Dr. Robert E. Botts, O.D.; B. Wayne Lanthorn, Ph.D., a licenced psychologist; Wise County Behavioral Health Services; Dr. Samch A. Ward, M.D.; and Indian Path Hospital. Caudill's attorney submitted additional medical records from Indian Path Medical Center and Wise County Behavioral Health Services to the Appeals Council.[7]

From June 14, 1999, to December 1, 2003, Caudill saw Dr. Louise J. Brazee, M.D., her treating physician. (R. at 122-35, 146-61, 221-24, 289-98.) Over this time period, Caudill's main complaints were lower abdominal pain, bladder pain and burning with urination. (R. at 122-26, 146-52, 222-24, 289-90, 296-98.) Caudill was diagnosed with recurrent urinary tract infections, chronic dysuria and interstitial cystitis with constant abdominal pain. (R. at 122, 124-26, 146, 148, 151-52, 223-24, 290, 296, 298.) She was placed on various medications, including amitryptiline,

---

[7]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), the court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-9-

Elmiron, Elavil, Tofranil and hydroxizine to treat her bladder pain. (R. at 123-25, 147-48, 151, 221-24, 289-90, 295-98.) After complaining of extreme sleepiness due to her medications, they were adjusted. (R. at 224.) At no time during Dr. Brazee's treatment of Caudill did Caudill complain of any mental impairment.

Caudill saw Dr. Marguerite C. Lippert, M.D., a urologist, on October 31, 2000. (R. at 136-37.) At that time, Dr. Lippert noted that she had placed Caudill on Elavil in 1992 for treatment of interstitial cystitis. (R. at 136.) Dr. Lippert further noted that Caudill had initially done well on Elavil, but that over the previous year, her symptoms were no longer controlled with the medication. (R. at 136.) Thus, Dr. Lippert stated that Dr. Brazee switched Caudill to imipramine or Tofranil, but this was not as effective as the Elavil had been. (R. at 136.) Thus, Caudill, on her own, discontinued the imipramine and increased the dosage of Elavil to an effective level. (R. at 136.)

On July 13, 2001, Caudill saw Dr. Kevin Blackwell, D.O., for a consultative examination. (R. at 138-41.) At that time, Dr. Blackwell noted that Caudill denied any anxiety or depression. (R. at 138.) However, she stated that she had nerve problems, but that it was related to "nerves in her bladder." (R. at 138.) At the time of the evaluation, Caudill noted that she was taking Elmiron, Elavil and hydroxyzine. (R. at 139.) Dr. Blackwell noted that Caudill was alert and fully oriented and appeared to have good mental status and thought content. (R. at 139.)

From February 12, 2002, through June 29, 2004, Caudill was seen at Wise County Behavioral Health Services. (R. at 163-77, 186-91, 214-20, 274-88, 387-427.)

-10-

On February 12, 2002, Caudill complained of extreme fatigue that made her sleep all of the time. (R. at 425.) She expressed difficulty with concentration and long-term memory. (R. at 425.) She opined that her depression stemmed from her limited physical activity. (R. at 425.) It was noted that Caudill was depressed, withdrawn, anxious, agitated and experienced sleep disturbances and appetite disturbances. (R. at 426.) On February 22, 2002, Jessica Miller, a social worker, diagnosed Caudill with a major depressive disorder. (R. at 427.) On November 18, 2003, Caudill's GAF score was assessed at 60. (R. at 423.) On December 1, 2003, Caudill's diagnoses, including her GAF score of 60, remained unchanged. (R. at 422.) On April 16, 2004, James Kegley, another social worker, completed an intake form, noting that Caudill suffered from depression or a mood disorder. (R. at 412-18.) He noted that Caudill had participated previously in psychotherapy, but quit for financial reasons. (R. at 413.) No potential learning deficits were noted. (R. at 418.) Caudill was diagnosed by Heather Dorton, another social worker, with a major depressive disorder, and her GAF score was again assessed at 60. (R. at 406.) On May 18, 2004, Caudill was again diagnosed with a major depressive disorder, but her then-current GAF score was assessed at 50. (R. at 395, 419.) It was recommended that Caudill begin individual and group psychotherapy. (R. at 421.) On May 24, 2004, Caudill was again diagnosed with a major depressive disorder and a GAF score of 50. (R. at 393.) Her diagnoses remained unchanged on May 25, June 1, June 8, June 15, June 22, and June 29, 2004. (R. at 387-92.) On May 25, June 1, June 8, and June 15, 2004, Kegley noted that Caudill's mood and affect were appropriate. (R. at 389-92.) Caudill did not attend therapy on June 22, or June 29, 2004. (R. at 387-88.)

On April 11, 2003, Caudill again saw Dr. Blackwell for a consultative

examination. (R. at 225-30.) At that time, Caudill reported "some depression." (R. at 225.) She noted her then-current medications as Elavil, Elmiron and Aleve. (R. at 225.) Dr. Blackwell noted that Caudill was alert, cooperative and fully oriented with good mental status, good thought content and a broad fund of knowledge. (R. at 226.) He diagnosed her with depression, among other things. (R. at 227.) Dr. Blackwell found no limitations pertaining to Caudill's complaints. (R. at 227-28.)

On April 28, 2003, Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Caudill suffered from a nonsevere affective disorder, namely a depressive syndrome. (R. at 232-45.) Tenison found that Caudill was, at most, mildly restricted in her activities of daily living, experienced no difficulties in maintaining social functioning, in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 242.) Tenison noted that Caudill's mental allegations were not credible and that her activities of daily living did not appear to be significantly limited by psychological factors and she displayed a normal mental status at her physical consultative examination. (R. at 244.) This assessment was affirmed by Howard Leizer, Ph.D., another state agency psychologist, on July 8, 2003. (R. at 232.)

On July 8, 2003, Caudill saw Dr. Robert O. McGuffin, M.D., for complaints of anxiety, depression, interstitial cystitis, muscle and joint pain, migraines, gastrointestinal pain and nausea. (R. at 246.) Dr. McGuffin completed a Report of Contact form where he found that Caudill had no severe impairment and that her statements are not credible. (R. at 246.) Dr. McGuffin found Dr. Brazee's statement of April 16, 2003, to not be supported by the medical evidence record. (R. at 246.)

-12-

On December 19, 2003, Caudill saw Dr. Samch A. Ward, M.D., complaining of bladder and pelvic pain. (R. at 328-29.) Dr. Ward diagnosed her with interstitial cystitis, possible chronic urinary tract infection and chronic depression. (R. at 329.) Dr. Ward prescribed her desipramine for her depression. (R. at 329.)

On August 25, 2003, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, and Donna Abbott, M.A., a licensed psychological examiner, examined Caudill. (R. at 247-52.) Caudill denied having ever been treated at a mental health center by a psychiatrist. (R. at 248.) Caudill noted that she graduated from high school, but did not relate having been in any special education classes. (R. at 248.) Lanthorn and Abbott noted that Caudill appeared to be appropriately oriented in all spheres, but she was reportedly suffering from cataracts and her overall effort was poor. (R. at 248, 252.) Lanthorn and Abbott stated that Caudill's memory processes appeared intact. (R. at 248.) They further noted that Caudill's abstract abilities were good. (R. at 248.) Her usage of common sense was deemed fair. (R. at 249.) Lanthorn and Abbott found Caudill able to attend, concentrate and follow directions and complete tasks. (R. at 249.) They noted that Caudill's affect was somewhat variable, noting that she initially presented as depressed, but later in the examination, her affect appeared "quite appropriate." (R. at 249.) Caudill denied any hallucinations, and no overt signs of a thought disorder or delusional thinking were noted. (R. at 249.) In fact, Lanthorn and Abbott noted that Caudill appeared rational and alert. (R. at 249.) They noted that Caudill's stream of conversation was logical and goal-directed. (R. at 249.) Caudill described her mood as "not too good." (R. at 249.) Lanthorn and Abbott noted that Caudill did not appear to put forth a good effort and that some degree of malingering was suggested. (R. at 249.) Lanthorn and

Abbott stated that Caudill related appropriately to them and should be able to relate adequately to others. (R. at 249-50.) They opined that Caudill was able to manage her own resources. (R. at 250.)

Lanthorn and Abbott administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), on which Caudill achieved a verbal IQ score of 70, a performance IQ score of 60 and a full-scale IQ score of 63, placing her in the extremely low range of intellectual functioning. (R. at. 250.) Again, it was noted that Caudill did not appear to put forth her best effort. (R. at 251.) The Wide Range Achievement Test-Third Edition, ("WRAT-3"), also was administered, showing that Caudill functioned at a sixth-grade reading level, a sixth-grade spelling level and a third-grade math level. (R. at 251.) After being explained the Minnesota Multiphasic Personality Inventory-Second Revision, ("MMPI-2"), Caudill stated that she could not read the test due to her cataracts. (R. at 251.) She offered to complete this test after her upcoming cataract surgery. (R. at 251.) Caudill further noted difficulty completing the Digit Symbol subtest of the WAIS-III, but this was the only item she reported difficulty seeing. (R. at 251.)

Lanthorn and Abbott diagnosed Caudill with rule out malingering, marital problems and a then-current GAF score of 65,[8] among other things. (R. at 251-52.) Lanthorn and Abbott made no Axis II diagnosis. (R. at 252.) Lanthorn and Abbott concluded that Caudill did not appear to put forth her best effort at the time of testing

---

[8]A GAF score of 61 to 70 indicates that the individual has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but [is] generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

and appeared to attempt to present herself in a somewhat negative light with the inconsistencies on test results and her manner of presentation, including appearing depressed at one time, but not at others. (R. at 252.) Lanthorn and Abbott further noted that secondary gain may be a factor. (R. at 252.) They noted that, due to Caudill's cataracts, her offer to return after the completion of cataract surgery to take the MMPI-2 should be considered due to the suggestion of malingering. (R. at 252.)

Abbott completed a Mental Assessment Of Ability To Do Work-Related Activities, on September 18, 2003. (R. at 253-55.) She concluded that Caudill had an unlimited ability to understand, remember and carry out simple job instructions. (R. at 254.) She further concluded that Caudill had good abilities to follow work rules, to relate to co-workers, to use judgment and to maintain personal appearance. (R. at 253-54.) Abbott found that Caudill had fair abilities to deal with the public, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 253-54.) Finally, Abbott concluded that Caudill had poor abilities to understand, remember and carry out complex job instructions and to demonstrate reliability. (R. at 254.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process

-15-

requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 24, 2004, the ALJ denied Caudill's claims. (R. at 15-23.) The ALJ found that Caudill met the nondisability insured status requirements of the Act through the date of the decision. (R. at 23.) The ALJ found that Caudill had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 23.) The ALJ found that the medical evidence established that Caudill had a history of interstitial cystitis. (R. at 23.) However, the ALJ concluded that Caudill did not suffer from a severe impairment. (R. at 23.) Therefore, the ALJ found that Caudill

-16-

was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(c), 416.920(c) (2006).

Caudill argues that the ALJ erred by improperly weighing the evidence. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 4-6.) Specifically, Caudill argues that the ALJ erred by not properly weighing the evidence that supports that she suffers from major depressive disorder and a GAF score of 50. (Plaintiff's Brief at 4-6.)

Based on my review, I find that substantial evidence exists in the record to support this finding. Nonetheless, I will remand Caudill's claims to the Commissioner for further review because I find that substantial evidence does not support the Commissioner's finding that Caudill does not suffer from a severe impairment, in that the uncontradicted medical evidence shows that Caudill suffers from intersitial cystitis which has required treatment for allegations of chronic pain.

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

As previously stated, Caudill argues that the ALJ erred by failing to find that she suffered from a severe nonexertional impairment. (Plaintiff's Brief at 4-6.) Caudill first notes that she consistently received a diagnosis of major depressive disorder and a GAF score of 50 while being treated at Wise County Behavioral Health Services. She correctly notes that such a GAF assessment indicates serious symptoms or serious impairments in social or occupational functioning. However, contrary to Caudill's contention, I cannot find that she was consistently assessed a GAF score of 50. On April 16, 2004, Heather Dorton, a social worker at Wise County Behavioral Health Services, assessed Caudill's GAF score at 60. (R. at 406.) However, on May 18, 2004, Kegley, another social worker, assessed Caudill's GAF score at 50. (R. at 395, 419.) Kegley's treatment notes do not indicate why Caudill's score dropped from 60 to 50. In fact, Kegley noted that, although Caudill had a mental disorder that might result in a chronic disability, he further noted that the disability did not result in functional limitations in major life activities. (R. at 398.) I further note that, while the

-18-

form completed by Kegley on May 18, 2004, indicated that Caudill's then-current GAF score was 50, it also indicated that her highest GAF score over the previous six months also was 50. (R. at 399.) This is simply incorrect. As mentioned above, in April 2004, Dorton placed Caudill's GAF score at 60. (R. at 406.) Psychological expert Schacht offered some insight into this discrepancy by stating that the score of 50 is the automatic GAF score that was likely inserted by the computer into the treatment notes and simply got carried through into the later treatment notes. (R. at 469.) I further note that in August 2003, Lanthorn and Abbott placed Caudill's GAF score at 65, indicating only mild symptoms. (R. at 252.) Moreover, for the reasons stated below, I find that the medical evidence of record simply does not support a GAF score of 50 or that Caudill suffers from a severe mental impairment.

I first note that Caudill never complained of any mental impairment to her treating physician, Dr. Brazee. Although Caudill has been diagnosed with depression, she has been placed on only one antidepressant for depression. Specifically, in December 2003, Dr. Ward placed Caudill on desipramine for depression. (R. at 329.) However, Dr. Ward's treatment notes contain no objective findings regarding Caudill's depression. Instead, it appears that Dr. Ward's diagnosis of chronic depression was based on Caudill's subjective complaints. I further note that despite Dr. Ward's diagnosis of chronic depression, he stated that Caudill was alert, fully oriented, pleasant and cooperative with an appropriate affect. (R. at 329.) While Caudill has been prescribed Elavil, an antidepressant, in the past, the record clearly establishes that this medication was prescribed to treat the symptoms of interstitial cystitis. While Caudill did receive counseling at Wise County Behavioral Health Services from February 2002 to June 2004, these notes merely reflect a diagnosis of

-19-

major depressive disorder without any accompanying treatment notes from which to glean the reasoning for such a diagnosis. In any event, on May 25, June 1, June 8, and June 15, 2004, it was noted that Caudill's affect was appropriate. (R. at 389-92.) Furthermore, Caudill regularly saw only two social workers at Wise County Behavioral Health Services. The regulations are clear that social workers are not considered acceptable medical sources who can provide evidence to establish an impairment. *See* 20 C.F.R. §§ 404.1513, 416.913 (2006).

The other evidence of record supports the ALJ's finding that Caudill did not suffer from a severe mental impairment. For instance, in July 2001, Dr. Blackwell noted that Caudill denied any anxiety or depression. (R. at 138.) He noted that Caudill was alert and fully oriented an appeared to have a good mental status and thought content. (R. at 139.) Dr. Blackwell again saw Caudill in April 2003, at which time she reported only "some depression." (R. at 225.) Dr. Blackwell again noted that Caudill was alert, cooperative and fully oriented with good mental status, good thought content and a broad fund of knowledge. (R. at 226.) Dr. Blackwell diagnosed Caudill with depression, but found no limitations pertaining to any of Caudill's complaints. (R. at 227-28.) Later that month, state agency psychologist Tenison found that Caudill suffered from a nonsevere depressive syndrome. (R. at 232-45.) He concluded that she was only, at most, mildly restricted in her activities of daily living, experienced no difficulties in maintaining social functioning, in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 242.) Tenison concluded that Caudill's mental allegations were not credible, and he found that her activities of daily living did not appear to be significantly limited by psychological factors. (R. at 244.) State agency psychologist

Leizer affirmed Tenison's findings. (R. at 232.) On July 8, 2003, state agency physician McGuffin found Caudill's statements incredible, and he concluded that she suffered from no severe impairment. (R. at 246.)

As noted previously, although Dr. Ward, in December 2003, diagnosed Caudill with chronic depression and prescribed desipramine, it appears that this diagnosis was based on Caudill's subjective allegations. (R. at 328-29.) Despite this diagnosis, Dr. Ward noted that Caudill was alert and fully oriented and was pleasant and cooperative. (R. at 329.) He further stated that her affect was appropriate. (R. at 329.) In August 2003, Caudill's scores on the WAIS-III placed her in the extremely low range of intellectual functioning. (R. at 250.) However, Lanthorn and Abbott noted that it appeared that Caudill did not put forth her best effort and that malingering was suggested. (R. at 251.) At that time, Caudill experienced difficulty reading some test items on the MMPI-2 test and on one portion of the WRAT-3 test. (R. at 251.) Otherwise, she had no complaints of difficulty during testing due to her vision. Lanthorn and Abbott made no Axis II diagnosis. (R. at 252.)

In September 2003, Abbott found that Caudill had an unlimited ability to understand, remember and carry out simple job instructions. (R. at 254.) She further found that she had good abilities in four areas of adjustment, fair abilities in eight areas of adjustment and poor abilities in only two areas of adjustment, namely the abilities to understand, remember and carry out complex job instructions and to demonstrate reliability. (R. at 253-54.)

While I find that this evidence supports the Commissioner's finding that Caudill

did not suffer from a severe mental impairment, I find that the evidence of record does not support the Commissioner's finding that Caudill did not suffer from a severe impairment. The undisputed medical evidence shows that Caudill suffers from interstitral cystitis, a condition which can cause nonexertional limitations, including pain. That being the case, the Commissioner's finding that Caudill does not suffer from "any significant abnormality capable of causing significant pain" is not supported. (R. at 22.) Therefore, I will remand this case for proper consideration of Caudill's complaints of disabling pain.

## IV. Conclusion

For the foregoing reasons, Caudill's and the Commissioner's motions for summary judgment will be denied and the Commissioner's decision denying benefits will be vacated and remanded for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED:     This 12th day of October 2006.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-22-